FILED

DEC 17 2020

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N D I C T M E N T |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:20 CR 842 |
| | ) | |
| THOMAS COLLINS, | ) | |
| PATRICK THOMAS, | ) | Title 15, United States Code, |
| HUGHE DUWAYNE GRAHAM, | ) | Sections 78j(b), 78ff; Title 18, |
| BRIAN KINGSFIELD, | ) | United States Code, Sections |
| TYLER PAULSON, | ) | 371, 981, 1343, and 2; Title 17, |
| GARY KOULETAS, | ) | Code of Federal Regulations, |
| DAMON DURANTE, | ) | Section 240.10b-5 |
| PAUL GIARMOLEO, | ) | |
| DALE PEARLMAN, | ) | |
| | | JUDGE POLSTER |
| Defendants. | | |

## GENERAL ALLEGATIONS

At all times material to this Indictment:

**A.**   **Defendants**

1.     Defendant THOMAS COLLINS ("COLLINS") was a resident of Texas.

2.     Defendant PATRICK THOMAS ("THOMAS") was a resident of Texas.

3.     Defendant HUGHE DUWAYNE GRAHAM ("GRAHAM") was a resident of California.  GRAHAM used the alias "MIKE STRONG".

4.     Defendant BRIAN KINGSFIELD ("KINGSFIELD") was a resident of California. KINGSFIELD used the alias "BRIAN EVANS".

5.     Defendant TYLER PAULSON ("PAULSON") was a resident of California and Costa Rica.

6.     Defendant GARY KOULETAS ("KOULETAS") was a resident of New Jersey.

7.     Defendant DAMON DURANTE ("DURANTE") was a resident of California.

8.     Defendant PAUL GIARMOLEO ("GIARMOLEO") was a resident of New York.

9.     Defendant DALE PEARLMAN ("PEARLMAN") was a resident of California. PEARLMAN used the alias "DENNIS JOHNSON".

**B.     Relevant Entities, and Bank Accounts**

10.     Avila P&H LLC ("AVILA") was registered on or about June 11, 2018 as a Wyoming limited liability company with its principal place of business in Sheridan, Wyoming. On or about September 25, 2018, THOMAS opened AVILA bank account x8300 at Plains Capital Bank.  On or about March 8, 2019, THOMAS opened AVILA bank account x6811 at Wells Fargo Bank.

11.     Gulf Coast M&A LTD ("GCMA") was registered on or about April 9, 2020, as a Wyoming corporation with its principal place of business in Sheridan, Wyoming.  On or about April 10, 2020, THOMAS opened GCMA bank account x9842 at Wells Fargo Bank.

12.     HDG Global Marketing, LLC ("HDG Global"), was registered on or about October 11, 2018, as a California limited liability company with its principal place of business in Corona, California.  GRAHAM and Individual-1 were listed as the members and managers of HDG GLOBAL.  On or about May 30, 2019, GRAHAM and Individual-1 opened HDG Global bank account number x5003 at JP Morgan Chase Bank.

13.     Private Resources LLC ("Private Resources") was registered on or about July 16, 2014, as a Wyoming Limited Liability Company with its principal place of business in West Sayville, NY.  GIARMOLEO was listed as the Organizer.

14.     Streamworx Consulting LLC ("Streamworx") was registered on or about November 19, 2018, as a Wyoming Limited Liability Company with its principal place of

business in Sheridan, Wyoming. On or about November 20, 2018, Nominee-1 opened
Streamworx bank account x4100 at Plains Capital Bank.

15. Sims Investment Holdings ("Sims") was registered on or about June 14, 2018, as
a Wyoming corporation with its principal place of business in Sheridan, Wyoming. On or about
June 18, 2018, THOMAS opened Sims bank account x5213 at Wells Fargo. On or about June
20, 2018, THOMAS opened Sims brokerage account x8337 at Charles Schwab.

16. Super Boat Marine, Inc. ("Super Boat") was registered on or about July 11, 2016
as a Florida corporation. PAULSON was listed as the incorporator and officer of Super Boat.
On or about August 3, 2016, PAULSON opened Super Boat bank account x0166 at J.P. Morgan
Chase.

17. Verde Asset Management LLC ("Verde") was registered on or about September
18, 2017 as a California limited liability company with its principal place of business in Laguna
Beach, California. On or about October 29, 2018, DURANTE opened Verde bank account
x6127 at Citibank.

18. View Point Health Investments LLC ("View Point") was registered on or about
February 2, 2015, as a Wyoming limited liability company with its principal place of business in
Sheridan, Wyoming. On or about August 28, 2015, THOMAS opened View Point bank account
number x4716 at Wells Fargo Bank.

19. PAG Group LLC ("PAG") was registered on or about February 28, 2014 as a
Wyoming limited liability company with its principal place of business in Hackensack, New
Jersey. PAG maintained brokerage account x0548 at Business 1.

20. Classic Real Estate Holdings ("Classic") was registered on or about July 25, 2018
as a Wyoming corporation with its principal place of business in Sheridan, Wyoming. On or

about October 23, 2018, COLLINS opened Classic bank account x0302 at Plains Capital Bank. On or about March 11, 2019, COLLINS opened Classic bank account x2881 at First Financial Bank.

21.     On or about October 6, 2016, COLLINS opened bank account number x9396 in his name at JP Morgan Chase Bank.

22.     On or about November 12, 2015, COLLINS opened brokerage account x9771 at TD Ameritrade.

23.     On or about January 26, 2006, THOMAS opened brokerage account x1990 at TD Ameritrade.

24.     On or about October 11, 2019, Co-Conspirator 2 opened Global Resource Energy, Inc. bank account number x7930 at Wells Fargo Bank.

25.     On or about October 17, 2019, Co-Conspirator 2 and another individual opened TVM LLC bank account number x2046 at Wells Fargo Bank.

C.     **Relevant Publicly Traded Companies**

26.     Global Resource Energy, Inc., ("GBEN") was a publicly traded Nevada corporation and was registered on or about November 6, 2008, with its principal place of business in Fort Worth, Texas.  Individual-2 was the Chief Executive Officer and Chief Financial Officer of GBEN.  GBEN's business purportedly focused on the health and wellness, green, and lifestyle sectors, specifically the manufacturing and distribution of a ready-to-drink hemp infused cocktail called "Hemp Hazed."  The company's stock traded on OTC Markets under the ticker GBEN.

27.     OTC Markets, Inc. ("OTC Markets") was an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and

issuers. Companies trading on OTC Markets tended to be very small, and the stock tended to be closely held (i.e., owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

**D.      Defendants Roles in the Scheme**

28.      COLLINS controlled a substantial number of outstanding, restricted, and free-trading shares of GBEN through his family members, co-conspirators, and associates over which he had influence and control. COLLINS used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes. COLLINS paid kickbacks to unlicensed stockbrokers for soliciting and selling shares of GBEN to investors.

29.      THOMAS controlled a substantial number of outstanding, restricted, and free-trading shares of GBEN through his personal companies, co-conspirators, family members, and associates over which he had influence and control. THOMAS used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes.

30.      GRAHAM worked as an unlicensed stockbroker and solicited potential investors to purchase shares in GBEN. GRAHAM received kickbacks or undisclosed commissions for the sale of shares of GBEN to investors. GRAHAM also received and paid kickbacks to other unlicensed stockbrokers for soliciting and selling shares of GBEN to investors.

31.      PAULSON controlled a substantial number of outstanding, restricted, and free-trading shares of GBEN through his personal companies, co-conspirators, family members, and associates over which he had influence and control. PAULSON used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes.

32.      THOMAS, COLLINS and PAULSON arranged a profit-sharing agreement from proceeds of stock sales from convertible notes in GBEN.

33.     KOULETAS operated PAG Group LLC, an unregistered broker-dealer. KOULETAS liquidated shares of GBEN into the stock market for the benefit of COLLINS, THOMAS, and PAULSON. KOULETAS received compensation, in the form of kickbacks or commissions, for selling the shares of GBEN.

34.     GIARMOLEO operated PAG Group LLC, an unregistered broker-dealer. GIARMOLEO liquidated shares of GBEN into the stock market for the benefit of COLLINS, THOMAS, and PAULSON. GIARMOLEO received compensation, in the form of kickbacks or commissions, for selling the shares of GBEN.

35.     KINGSFIELD, an unlicensed stockbroker, solicited investors to purchase shares in GBEN. KINGSFIELD controlled a substantial number of outstanding, restricted, and free-trading shares of GBEN through his personal companies, co-conspirators, and associates over which he had influence and control. KINGSFIELD received kickbacks or undisclosed commissions for the sale of both restricted and free trading shares of GBEN to investors. KINGSFIELD also received and paid kickbacks to other unlicensed stockbrokers for soliciting and selling shares of GBEN to investors.

36.     DURANTE controlled a substantial number of outstanding, restricted, and free-trading shares of GBEN through his personal companies, co-conspirators, and associates over which he had influence and control. DURANTE received kickbacks or undisclosed commissions for the sale of both restricted and free trading shares of GBEN. DURANTE also received and paid kickbacks to other unlicensed stockbrokers for soliciting and selling shares of GBEN to investors.

37.     PEARLMAN, an unlicensed stockbroker, solicited potential investors to purchase shares of GBEN.  PEARLMAN received kickbacks or undisclosed commissions for the sale of shares of GBEN to investors.

       i.     Co-Conspirators

38.     Co-Conspirator 1 was a registered stockbroker and a "market maker" at Broker-Dealer-1.  Co-Conspirator 1 utilized his position as a market maker to facilitate match trades for the benefit of co-conspirators.

39.     Co-Conspirator 2 was the Chief Executive Officer of GBEN.

      ii.     Nominees

40.     Nominee-1, Nominee-2, Nominee-3, and Nominee-4 were family members, and associates of the Defendants, who (a) helped conceal the beneficial ownership of GBEN for the benefit of the Defendants and (b) received and made payments on behalf of the Defendants.

      v.     Attorneys

41.     The Defendants, and others, provided attorneys with fraudulent information to obtain legal opinions under Title 17, Code of Federal Regulations, Section 230.144, et al., often referred to as Rule 144.  These Rule 144 legal opinions contained misrepresentations concerning the relationship between the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations.  The Defendants, and others, provided these Rule 144 legal opinions to brokerage houses and transfer agents to satisfy legal requirements for depositing the stock and lifting share restrictions.

**E.     The SEC and Securities Regulations**

42.     The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded

securities, including securities traded on the United States-based stock exchanges. Stock for the Manipulated Public Companies was registered with the SEC.

43.     Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to: (a) the SEC in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in the companies subject to SEC regulations; and (c) the public. Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

44.     Failure to disclose to investors the commission payments from third parties, including payments from issuers, was considered an omission of a material fact as part of a securities transaction under federal securities law.

45.     "Kickbacks" were paid to co-conspirators in a variety of ways, including but not limited to, undisclosed commissions for selling shares, retainage of illicit proceeds, and heavily discounted blocks of shares so the co-conspirator could also profit from the manipulated stock.

46.     The term "issuer" in the Securities Act included any person directly or indirectly controlling or controlled by, or any person under direct or indirect common control with, the issuer.

**F.      Relevant Regulatory Principles and Definitions**

47.     "Microcap" or "penny" stocks were stocks of publicly traded U.S. companies with a low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that are traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a

small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

48.     Convertible debt was a form of short-term debt that could be converted into equity.  Small publicly traded companies typically needed money for expenses or capital they normally could not afford.  Issuing convertible debt in the form of notes gave the company instant cash flow for expenses and the lender or future shareholder received the right to convert the note into equity in the company.  There were restrictions and guidelines set forth by regulating bodies such as the SEC, however, that required certain disclosures associated with these transactions.

49.     Section 10(b) of the Exchange Act of 1934 and Rule 10b-5 made it illegal for anyone to, among other things, employ any scheme to defraud, make an untrue statement or omission of material fact, or engage in any act, practice, or course of business, in connection with the purchase or sale of any security—regardless of whether the registered public company was registered under Section 12 of the Securities Act or required to file reports under Section 15(d) of the Securities Act or "unregistered."

50.     Market manipulation schemes known as "pump and dump" schemes typically involved creating a price for a security that was not reflective of true market value, thereby allowing the Defendants holding large blocks of the inflated stock to sell shares they obtained for little or no money at the inflated price.  The purchasing party was left with a near-worthless security when the price dropped to accurately reflect the stock's true value, or lack thereof, in the market.  There were generally three phases to a pump and dump scheme: (i) obtaining and concealing control of a significant portion of a publicly traded company's stock, (ii) fraudulently inflating or keeping inflated the price and trading volume of the company's stock through a

variety of means, including controlling the release of favorable news, directing and coordinating with promoters and co-conspirators by providing press releases and other materials in advance of its release to the public, and obfuscating the parties paying for the promotion; and (iii) after the price of the stock was fraudulently inflated, selling the stock using the fraudulently inflated price as a benchmark, thereby profiting at the expense of the investing public.

<u>THE SCHEME TO DEFRAUD</u>

51.     From in and around February 2014 through on or about August 18, 2020, COLLINS, THOMAS, GRAHAM, KINGSFIELD, PAULSON, KOULETAS, DURANTE, GIARMOLEO, PEARLMAN, and others, known and unknown to the Grand Jury, knowingly and intentionally conspired to commit an offense against the United States, that is, Securities fraud, by conspiring and agreeing to defraud investors and potential investors in GBEN by issuing millions of stock/shares to themselves at little or no cost and then artificially controlling the price and volume of shares by, among other means: (a) using convertible notes to issue debt to themselves or nominees who then converted the debt into freely tradeable GBEN shares, thereby fraudulently concealing the Defendants ownership or control interests in GBEN; (b) fraudulently engineering price movements and trading volume in the GBEN stock; and (c) paying kickbacks or undisclosed commissions to unregistered brokers to solicit investors to purchase GBEN shares from the defendants.

**A.    The Pump: Inflation of the Fraudulent Stock of the Manipulated Public Companies**

52.     After gaining control of GBEN, COLLINS, THOMAS, GRAHAM, KINGSFIELD, PAULSON, KOULETAS, DURANTE, GIARMOLEO, and PEARLMAN, together with others, devised and intended to devise a scheme whereby they fraudulently inflated GBEN's share price and trading volume and then orchestrated the sale and purchase of GBEN stock at a profit.

53.     COLLINS, THOMAS, GRAHAM, KINGSFIELD, PAULSON, KOULETAS, DURANTE, GIARMOLEO, PEARLMAN, and others sought to manipulate the GBEN shares through soliciting investors over the phone to purchase GBEN shares.  Having control of significant amounts of the stock, COLLINS, THOMAS, GRAHAM, KINGSFIELD, PAULSON, KOULETAS, DURANTE, GIARMOLEO, PEARLMAN, and others controlled the volume of trading by coordinating the sale of large blocks of shares timed with the solicitation of public investors and the issuance of press releases by the company.

54.     COLLINS, THOMAS, PAULSON, and others, placed manipulative trades for the purpose of increasing the share price of GBEN.

55.     COLLINS, THOMAS, PAULSON, and others, used nominees to conceal beneficial ownership of GBEN shares.

56.     During the periods when GBEN's stock was being promoted and manipulated, the value of the stocks had little or no relation to their actual current and future earnings potential or business operations.

**B.      The Dump: Profits at Investors' Expenses**

57.     COLLINS, THOMAS, GRAHAM, KINGSFIELD, PAULSON, KOULETAS, DURANTE, GIARMOLEO, PEARLMAN, and others known and unknown to the Grand Jury, obtained millions of shares in GBEN at little or no cost and then profited by selling shares in GBEN to investors at fraudulent and artificially inflated prices without disclosing that they controlled the shares being sold into the market or their relationship with and control of the GBEN.  Little, if any, portion of the investments went to fund the operations of GBEN.  Rather, COLLINS, THOMAS, GRAHAM, KINGSFIELD, PAULSON, KOULETAS, DURANTE, GIARMOLEO, PEARLMAN, and others used most of the investments to enrich themselves.

## COUNT 1
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371)

The Grand Jury charges:

58.    The allegations contained in paragraphs 1 through 57 are re-alleged and incorporated as though fully set forth herein.

59.    From in or around February 2014, through on or about August 18, 2020, defendants THOMAS COLLINS, PATRICK THOMAS, HUGHE DUWAYNE GRAHAM, BRIAN KINGSFIELD, TYLER PAULSON, GARY KOULETAS, DAMON DURANTE, PAUL GIARMOLEO, and DALE PEARLMAN, together with others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit offenses against the United States, to wit:

a.    To knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made false statements of material fact and omitting material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of Global Resource Energy, Inc. ("GBEN") securities, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud);  and

b.    To knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities

12

exchange, for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, (a) entering an order and orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same and different parties, and (b) entering any order and orders for the sale of any such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same and different, parties, in violation of Title 15, United States Code, Sections 78i(a)(1) and 78ff (Manipulative Securities Trading).

## OBJECTS OF THE CONSPIRACY

60.     The objects of the conspiracy included, but were not limited to: (1) defrauding the investors; (2) obtaining investor monies and paying and receiving undisclosed commissions; (3) inflating the value of GBEN; and (4) enriching the conspirators.

## MANNER AND MEANS

61.     It was part of the conspiracy that:

a. COLLINS, THOMAS, PAULSON, and others, obtained control of a public "shell" company and executed the acquisition or merger of businesses with the shell to create publicly traded companies.

b. COLLINS, THOMAS, PAULSON, and others, controlled convertible notes in GBEN, and then converted portions of the notes into free-trading, unrestricted shares.

c. COLLINS, THOMAS, GRAHAM, KINGSFIELD, DURANTE, PEARLMAN, and others, solicited the investing public to purchase restricted and free trading shares of GBEN.

d. COLLINS, THOMAS, PAULSON, and others, artificially inflated the price of shares of GBEN, to make the restricted stock investments more attractive to sell to the investing public.

e. COLLINS, THOMAS, GRAHAM, KINGSFIELD, DURANTE, and others, made material misrepresentations to investors including statements regarding the company, the structure of the restrict stock investment, the timing of the restricted hold period, and the use of the proceeds of the investment.

f. COLLINS, THOMAS, PAULSON, KOULETAS, GIARMOLEO and others, sold free trading shares into the market or had others sell shares on their behalf while concealing that they, in fact, controlled the shares of GBEN.

g. COLLINS, THOMAS, PAULSON, and others, used manipulative stock trading techniques, such as match trades and "painting the tape," to artificially inflate the share price of GBEN.

h. COLLINS, THOMAS, KOULETAS, GIARMOLEO, and others, sought out and provided false, incomplete and fraudulent information to attorneys in order to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing the stock for sale.

i. COLLINS, and others, caused the creation and release of favorable press releases and other information to promote GBEN.

j. COLLINS, THOMAS, and others provided press releases in advance of their public release to facilitate third party stock promotions.

k. COLLINS, GRAHAM, DURANTE, KINGSFIELD, and others paid undisclosed commissions and kickbacks to co-conspirators who helped facilitate the sale shares of the GBEN.

l. COLLINS, THOMAS, KINGSFIELD, DURANTE, and others caused the issuance and transfer of shares of GBEN through fraudulent consulting agreements.

m. COLLINS, THOMAS, GRAHAM, PAULSON, KINGSFIELD, DURANTE, PEARLMAN, KOULETAS, GIARMOLEO, and others, divided up the proceeds from the sale of restricted and free trading shares of the GBEN in accordance with their respective interests or commission in shares sold.

n. COLLINS, THOMAS, PAULSON, KINGSFIELD, DURANTE, PEARLMAN, KOULETAS, GIARMOLEO, and others, communicated with co-conspirators and others using interstate wires, including e-mail and encrypted messaging apps, to discuss manipulative stock trading techniques, payments made and money owed.

## OVERT ACTS

62.     In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed the following overt acts, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

a. On or about February 15, 2014, PAULSON caused the issuance of a $85,000 convertible note in GBEN.

b. On or about March 14, 2014, PAULSON caused the issuance of a $65,000 convertible note in GBEN.

c. On or about April 23, 2015, PAULSON caused the issuance of 3,500,000 shares of GBEN to Nominee-3.

d. On or about April 23, 2015, PAULSON caused the issuance of 3,500,000 shares of GBEN to himself.

e. On or about June 6, 2015, PAULSON caused the issuance of 3,500,000 shares of GBEN to Nominee-2.

f. On or about September 7, 2018, THOMAS caused a wire transfer of $5,000 from Sims brokerage account x8337 to PAULSON J.P. Morgan account x1627.

g. On or about September 7, 2018, THOMAS and PAULSON signed a share purchase agreement between Sims and PAULSON for 3,500,000 shares of GBEN.

h. On or about February 19, 2019, PAULSON and THOMAS caused the transfer of 3,500,000 shares of GBEN from PAULSON to View Point.

i. On or about the same date, PAULSON and THOMAS also caused the transfer of 3,500,000 shares of GBEN from Nominee-3 to View Point.

j. On or about March 1, 2019, GRAHAM, COLLINS, and others caused Victim-2 to wire $280,000 to Streamworx bank account x4100.

k. On or about March 1, 2019, THOMAS caused the transfer of $275,000 from Streamworx account x4100 to Avila P&H bank account x8300 at Plains Capital Bank.

l. Between on or about March 1, 2019, and on or about March 4, 2019, THOMAS and COLLINS caused the transfer of $187,200 to GRAHAM controlled HDG Global account x3016 at Wells Fargo.

m. On or about March 4, 2019, THOMAS and COLLINS caused the wire transfer of $19,000 from Avila P&H bank account x8300 to Classic Real Estate account x0302.

n. On or about March 4, 2019, THOMAS and COLLINS, caused the wire transfer of $15,000 to PAULSON controlled Super Boat account x0166 at J.P. Morgan.

o. On or about March 25, 2019, COLLINS and THOMAS caused the issuance of 3,000,000 shares of GBEN to Streamworx.

p. On or about March 27, 2019, KINGSFIELD caused Victim-1 to send a first wire transaction for $20,000 to VERDE for the purchase of 300,000 shares of GBEN.

q. On or about March 28, 2019, KOULETAS and GIARMOLEO caused the wire transfer of $10,000 from PAG account x2691 at Santander Bank to View Point account x4716 with the memo reference "GBEN SPA 1."

r. On or about March 28, 2019, KOULETAS provided a Stockholder Representation Letter, containing misrepresentations, to the Transfer Agent, which requested 500,000 to be issued as free-trading shares.

s. On or about April 1, 2019, GRAHAM, and others, caused Victim-6 to wire $50,000 to HDG Global account x3016 for the purchase of GBEN shares.

t. On or about April 2, 2019, GRAHAM caused the wire transfer of $16,275 from HDG Global account x3016 to Streamworx account x4100.

u. On or about April 3, 2019, THOMAS caused the payment of check 1001 from Streamworx account x4100, which was deposited into Avile account x6811.

v. On or about April 28, 2019, PEARLMAN, utilizing the alias "Dennis Johnson," sent a series of text messages soliciting Victim-3 to purchase shares of GBEN.

w. On or about April 29, 2019, PEARLMAN sent Victim-3 a text messaging providing Victim-3 a FedEx account number to utilize to mail Victim-3's check for an investment into GBEN.

x. On or about April 30, 2019, KINGSFIELD caused Victim-1 to send a second wire transaction for $40,000 to VERDE for the purchase of 300,000 shares of GBEN.

y. On or about May 1, 2019, PEARLMAN sent Victim-3 a text message confirming that PEARLMAN had received Victim-3's check via FedEx.

z. On or about May 31, 2019, COLLINS and Co-Conspirator 2 caused the transfer of 461,904 shares of GBEN from Streamworx to Verde.

aa. On or about June 11, 2019, THOMAS, KOULETAS, and GIARMOLEO caused the transfer of 500,000 shares of GBEN from View Point to PAG.

bb. On or about June 21, 2019, KOULETAS and GIARMOLEO caused the deposit of 500,000 shares into brokerage account x0548 at Business 1.

cc. On or about June 21, 2019, COLLINS and Co-Conspirator 2 caused the transfer of 500,000 shares of GBEN from Streamworx to Verde.

dd. On or about July 1, 2019, COLLINS purchased 200 shares of GBEN from brokerage account x9771 for $0.96 per share.  The trade placed at 15:58:33 and was the final trade of the day in GBEN shares.

ee. On or about July 8, 2019, KINGSFIELD caused the issuance of 300,000 GBEN shares to Victim-1.

ff. On or about July 11, 2019, GIARMOLEO and THOMAS exchanged text messages regarding wire instructions for the proceeds of GBEN stock sales to be sent to View Point Wells Fargo account x4716.

gg. On or about July 15, 2019, GIARMOLEO and KOULETAS caused a wire transfer in the amount of $250,000 to THOMAS controlled account View Point x4716 at Wells Fargo.

hh. On or about July 15, 2019, THOMAS caused the wire transfer of $30,000 to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

ii. On or about July 16, 2019, THOMAS caused the wire transfer $32,500 from View Point account x4716 for the benefit of KINGSFIELD.

jj. On or about July 18, 2019, KOULETAS and GIARMOLEO caused the wire transfer of $66,000 to a THOMAS-controlled View Point account.

kk. On or about July 19, 2019, THOMAS caused the wire transfer of $10,000 to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

ll. On or about July 22, 2019, GIARMOLEO sent a text message to THOMAS regarding the transfer of 3,000,000 GBEN shares from View Point to PAG that stated: "I spoke to Gary this morning he needs an opinion in PAG GROUP LLC for the 3million shares and the rest of the paperwork we sent signed off on so we can get this done for you guys"

mm. On or about July 26, 2019, COLLINS and THOMAS caused the transfer of 500,000 GBEN shares from Streamworx to Verde.

nn. On or about July 30, 2019, THOMAS, KOULETAS, and GIARMOLEO caused the transfer of 3,000,000 GBEN shares from View Point to PAG.

oo. On or about August 1, 2019, KOULETAS and GIARMOLEO caused the deposit of 3,000,000 GBEN shares into brokerage account x0548 at Business 1.

pp. On or about September 5, 2019, THOMAS caused the wire transfer of $10,000 to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

qq. On or about September 5, 2019, GRAHAM and COLLINS caused Victim-2 to wire transfer $50,000 to GBEN bank account x8600 at Plains Capital Bank.

rr. On or about September 6, 2019, COLLINS and Co-Conspirator 2, caused the wire transfer of $21,500 to GRAHAM controlled HDG Global bank account x5003 at JP Morgan Chase Bank for the payment of an undisclosed commission.

ss. On or about September 10, 2019, COLLINS and Co-Conspirator 2 caused the wire transfer of $5,000 to a THOMAS controlled View Point Health bank account x4716 at Wells Fargo.

tt. On or about September 30, 2019, COLLINS purchased 100 shares of GBEN from brokerage account x9771 for $1.02 per share.  The trade placed at 15:54:17 and was the final trade of the day at in GBEN shares.

uu. On or about October 3, 2019, PAULSON and THOMAS caused the transfer of 1,166,667 shares of GBEN from Nominee-2 to View Point.

vv. On or about October 18, 2019, THOMAS caused a $5,000 wire transfer to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

ww. On or about October 22, 2019, COLLINS, GRAHAM, and Individual-2 had a consensually recorded telephone conversation in reference to soliciting an undercover federal agent ("UC-1") to purchase restricted shares of GBEN.

xx. On or about October 24, 2019, UC-1 had a consensually recorded telephone conversation with COLLINS, GRAHAM, and Individual-2.  During the conversation COLLINS solicited UC-1 for an investment into GBEN.

yy. On or about October 24, 2019, COLLINS caused an email communication to be sent from info@gbeneficial.com, which contained a subscription agreement for the purpose of purchasing restricted shares in GBEN.

zz. On or about October 28, 2019, UC-1 initiated a wire transfer of $10,000 from a government-controlled bank account in the Northern District of Ohio, Eastern Division, to GBEN account x7930 for the purchase of 40,000 free trading shares of GBEN.

aaa. On or about October 28, 2019, GRAHAM caused Individual-2 to send a text message containing bank account wire instructions, for GRAHAM to pay Individual-2 a kickback for UC-1's purchase of GBEN shares.

bbb. On or about October 30, 2019, COLLINS and Co-Conspirator 2 caused a wire transfer of $4,000 transfer to HDG Global bank account x5003 at JP Morgan Chase Bank.

ccc. On or about October 30, 2019, GRAHAM caused a wire transfer in the amount of $2,475.00 from HDG Global to a government-controlled bank account located in the Northern District of Ohio, Eastern Division, which represented Individual-2's kickback from the sale of GBEN stock to UC-1.

ddd. On or about November 8, 2019, UC-1 initiated a wire transfer of $10,000 from a government-controlled bank account in the Northern District of Ohio, Eastern Division, to GBEN account x7930 for the purchase of 40,000 free trading shares of GBEN.

eee. On or about November 12, 2019, COLLINS and Co-Conspirator 2 caused a wire transfer of $4,000 transfer to HDG Global bank account x5003 at JP Morgan Chase Bank.

fff. On or about November 13, 2019, GRAHAM caused a $2,475 wire transfer from HDG Global to a government-controlled bank account located in the Northern District of Ohio, Eastern Division, which represented Individual-2's kickback from the sale of GBEN stock to UC-1.

ggg. On or about November 25, 2019, THOMAS caused the transfer of 4,666,667 shares of GBEN from View Point to GCMA.

hhh. On or about November 26, 2019, COLLINS and GRAHAM caused a stock certificate for 40,000 shares of GBEN to a government-controlled mailbox via FedEx.

iii. On or about November 26, 2019, THOMAS caused the wire transfer of $3,500 to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

jjj. On or about November 27, 2019, COLLINS and GRAHAM caused a stock certificate for 40,000 shares of GBEN to a government-controlled mailbox via FedEx.

kkk. On or about December 4, 2019, THOMAS caused the deposit of 2,000,000 shares of GBEN into a brokerage account at Tavira Securities in the name of GCMA.

lll. On or about December 16, 2019, THOMAS caused the wire transfer of $3,000 to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

mmm. On or about December 19, 2019, THOMAS caused the wire transfer of $2,000 to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

nnn. On or about December 20, 2019, THOMAS caused the wire transfer of $2,000 to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

ooo. On or about January 23, 2020, UC-1 initiated a wire transfer of $10,000 from a government-controlled bank account in the Northern District of Ohio, Eastern Division, to GBEN account x7930 for the purchase of 40,000 free trading shares of GBEN.

ppp. On or about January 24, 2020, COLLINS and Co-Conspirator 2 caused a wire transfer of $4,300 to HDG Global bank account x5003 at JP Morgan Chase Bank.

qqq. On January 24, 2020, GRAHAM caused a $2,475 wire transfer from HDG Global to a government-controlled bank account located in the Northern District of Ohio, Eastern Division, which represented Individual-2's kickback from the sale of GBEN stock to UC-1.

rrr. On or about January 27, 2020, GRAHAM and COLLINS caused Victim-4 to wire transfer $50,000 to GBEN bank account x7930 for the purchase of GBEN shares.

sss. On or about February 5, 2020, GRAHAM and COLLINS caused Victim-4 to wire transfer $25,000 to GBEN bank account x7930 for the purchase of GBEN shares.

ttt. On or about February 6, 2020, GRAHAM and COLLINS caused Victim-4 to wire transfer $25,000 to GBEN bank account x7930 for the purchase of GBEN shares.

uuu. On or about February 6, 2020, GRAHAM and COLLINS caused Victim-7 to wire transfer $25,000 to GBEN bank account x7930 for the purchase of GBEN shares.

vvv. On or about February 7, 2020, UC-1 and UC-2 had a consensually recorded meeting with COLLINS and Co-Conspirator 2.  During the meeting, COLLINS told UC-1 and

UC-2 that COLLINS held the GBEN stock certificate for 55,000,000 shares in the name of a deceased individual.

www. On or about January 27, 2020, COLLINS and Co-Conspirator 2 caused an $8,000 wire transfer to COLLINS controlled account x4615 at First Financial bank.

xxx. On or about February 7, 2020, COLLINS and Co-Conspirator 2 caused a $5,700 wire transfer to GRAHAM controlled HDG Global bank account x5003 at JP Morgan Chase Bank for the payment of an undisclosed commission.

yyy. On or about February 14, 2020, COLLINS and Co-Conspirator 2 caused payment of a $20,000 check from GBEN account x7930 to THOMAS controlled View Point Health bank account x4716 at Wells Fargo.

zzz. On or about February 14, 2020, KOULETAS and GIARMOLEO caused a $20,000 wire transfer from PAG account x7842 to THOMAS controlled View Point account x4716.

aaaa. On or about February 14, 2020, THOMAS caused a $3,500 wire transfer to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

bbbb. On or about February 18, 2020, THOMAS caused a $3,000 wire transfer from View Point account x4716 to COLLINS controlled Classic Real Estate account x2881 at First Financial bank.

cccc. On or about February 24, 2020, UC-1 and UC-2 had a consensually recorded telephone conversation with COLLINS, GRAHAM, and Co-Conspirator 2.  COLLINS solicited UC-1 and UC-2 for an investment into GBEN investments by the UCs. COLLINS discussed relationships he had with investor relation firms located in Texas,

New York, and Chicago and that he expected to spend $25,000 to $50,000 per month on investor relations for GBEN.

dddd. On or about February 27, 2020, GRAHAM caused a text message to be sent to UC-1 requesting UC-1 send the executed subscription agreement for UC-1's third investment into GBEN to COLLINS.

eeee. On or about March 6, 2020, UC-1 had a consensually recorded telephone conversation with THOMAS in which THOMAS discussed an arrangement with COLLINS to maintain an elevated share price and GBEN.

ffff. On or about March 9, 2020, COLLINS and GRAHAM caused the mailing of a GBEN stock certificate for 40,000 shares to an FBI controlled mailbox via FedEx.

gggg. On or about April 1, 2020, THOMAS caused a $10,000 wire transfer to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

hhhh. On or about April 16, 2020, the FBI initiated a $25,000 wire transfer from a government-controlled bank account to GCMA account x9842 for the purchase of 500,000 free trading shares of GBEN.

iiii. On or about April 20, 2020, THOMAS caused a $7,500 wire transfer to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

jjjj. On or about May 15, 2020, THOMAS caused the transfer of 500,000 GBEN shares from GCMA to a business controlled by UC-1.

kkkk. On or about June 5, 2020, the FBI initiated a $25,000 wire transfer from a government-controlled bank account to GCMA account x9842 for the purchase of 500,000 free trading shares of GBEN.

llll. On or about June 8.  2020, THOMAS caused a $7,500 wire transfer to PAULSON controlled Super Boat account x0166 at JP Morgan Chase Bank for PAULSON's portion of GBEN stock proceeds.

mmmm. On or about June 8, 2020, KINGSFIELD sent a series of text messages to COLLINS regarding the restricted stock scheme, including the following:

KINGSFIELD: "So let me try to explain how I feel... the shares for gben have cost me all my clients. I try to tell you how important it is buy hey no where"

KINGSFIELD: "Now the stock is dropping g so I will be sued and put in jail for lying and stealing money"

KINGSFIELD: "It was a simple thing we had going I would keep the stock prices up and you would let me sell some restricted to compensate"

KINGSFIELD: "Now there is no stock to sell I owe out at lesat 500 000 and the price is dropping"

KINGSFIELD later added: "I might have even done this promo if you had only showed me enough respect ti issue the stock and go over the accounting as I did 33,000 and got 5"

nnnn. On or about July 7, 2020, UC-2 initiated a $10,000 wire transfer from a government-controlled bank account to GCMA account x9842 for the purchase of 250,000 free trading shares of GBEN to be used for the promotion and manipulation of GBEN.

oooo. On or about July 22, 2020, KINGSFIELD and THOMAS exchanged a series of

text messages:

KINGSFIELD: [Sent a photograph of a stock certificate for 24,000 shares of GBEN

issued to Victim-5]

KINGSFIELD: "Is $.20 ok for him?"

KINGSFIELD: "I like this guy"

THOMAS: "Ok"

KINGSFIELD: "F[***]"

THOMAS: "Bob calling you"

pppp. On or about July 23, 2020, PAULSON and THOMAS exchanged a series of text

messages regarding GBEN:

PAULSON: "Is that us on Gben"

THOMAS: "That was the call room but got hit before could grab"

THOMAS: "Got great news, and the Corp for the shares is ready"

qqqq. On or about July 27, 2020, KOULETAS and THOMAS exchanged a series of text

messages regarding how many shares of GBEN KOULETAS maintained on deposit to

sell on behalf of THOMAS.

rrrr. On or about July 27, 2020, UC-1 had a consensually recorded telephone

conversation with THOMAS.  UC-1 and THOMAS discussed the timing of running the

GBEN promotion.  THOMAS disclosed that THOMAS and COLLINS had

approximately 2,500,000 to 3,000,000 shares of GBEN on deposit to be sold during the

promotion.

ssss. On or about July 30, 2020, PAULSON sent THOMAS a text message regarding the issuance of additional shares of GBEN.

tttt. On or about August 4, 2020, UC-1 had a consensually recorded telephone conversation with THOMAS.  THOMAS told UC-1 that THOMAS and COLLINs would provide press releases to UC-1 and UC-2 in advance of the promotion.

uuuu. On or about August 7, 2020, THOMAS caused the transfer of 500,000 free trading shares of GBEN from GCMA to a business controlled by UC-2.

vvvv. On or about August 7, 2020, THOMAS caused the transfer of 250,000 free trading shares of GBEN from GCMA to a business controlled by UC-2.

wwww. On or about August 11, 2020, UC-1 had a consensually recorded telephone conversation with COLLINS.  COLLINS told UC-1 that COLLINS would send the press releases for the promotion within 24 hours.  COLLINS confirmed he (COLLINS) would release news in conjunction with the promotion the following week.

xxxx. On or about August 12, 2020, PAULSON sent THOMAS a series of text messages which contained photographs of signed documentation to transfer shares of GBEN from Nominee-2 to Nominee-4.

yyyy. On or about August 12, 2020, THOMAS caused the transfer of 1,416,667 from GCMA to Nominee-4.

zzzz. On or about August 12, 2020, COLLINS caused the issuance of a press release on behalf of GBEN titled "GBEN Completes First Product Run with New Packaging."

aaaaa. On or about August 17, 2020, COLLINS caused the issuance of a press release on behalf of GBEN titled "G Beneficial, Inc. Launches Telehealth Platform Offering Patient

Access to Quality Health Care and Testing" as previously provided to UC-1 and UC-2 to begin the pump of GBEN.

bbbbb. On or about August 17, 2020, KOULETAS and THOMAS exchanged a series of text messages regarding the liquidation of GBEN shares during the planned manipulation GBEN, including the following:

THOMAS: "GBEN 1000@ 36.5, 1000@ 39.50, 1000@42.5

KOULETAS: "No trading. Systems are down"

THOMAS: "F[***], we got promo going"

All in violation of Title 18, United States Code, Section 371.

COUNTS 2-8
(Securities Fraud, 15 U.S.C. §§ 78j(b), 78ff and Title 17 C.F.R. § 240.10b-5)

The Grand Jury further charges:

63.     The factual allegations contained in paragraphs 1 through 57, and 61-62, are re-
alleged and incorporated as though fully set forth herein.

64.     On or about the dates listed below, in the Northern District of Ohio, Eastern
Division, and elsewhere, the Defendants listed below and others presently known and unknown
to the Grand Jury, did knowingly and willfully, directly and indirectly, by the use of the means
and instrumentalities of interstates commerce and of the mails, use and employ manipulative and
deceptive devices and contrivances in connection with the purchase and sale of securities by (a)
employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue
statements of material fact, and omitting to state material facts necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which operated and would operate as a
fraud and deceit upon any persons, including members of the investing public and sellers and
purchasers of the securities in Global Resource Energy, Inc. ("GBEN"), each act below
constituting a separate count.

| Count | Approx. Date of Sale to Investor | Approx. Amount of Shares | Ticker Symbol | Defendant(s) Charged | Proceeds of Stock Sale |
|---|---|---|---|---|---|
| 2 | 4/30/2020 | 30,000 | GBEN | KINGSFIELD, DURANTE, PEARLMAN | $10,500 |
| 3 | 11/1/2019 | 40,000 | GBEN | COLLINS, GRAHAM | $10,000 |
| 4 | 11/21/2019 | 40,000 | GBEN | COLLINS, GRAHAM | $10,000 |
| 5 | 2/28/2020 | 40,000 | GBEN | COLLINS, GRAHAM | $10,000 |

| Count | Approx. Date of Sale to Investor | Approx. Amount of Shares | Ticker Symbol | Defendant(s) Charged | Proceeds of Stock Sale |
|---|---|---|---|---|---|
| 6 | 4/16/2020 | 500,000 | GBEN | THOMAS, COLLINS | $25,000 |
| 7 | 6/5/2020 | 500,000 | GBEN | THOMAS, COLLINS | $25,000 |
| 8 | 7/7/2020 | 250,000 | GBEN | THOMAS, COLLINS | $10,000 |

All in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNTS 9-17
(Wire Fraud, 18 U.S.C. § 1343)

The Grand Jury further charges:

65.	The factual allegations contained in paragraphs 1 through 57, 61-62(ww)-(qqq), 62(cccc-bbbbb) are re-alleged and incorporated as though fully set forth herein.

66.	From on or about October 22, 2019, through on or about July 7, 2020, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants listed below and others known and unknown to the Grand Jury, knowingly devised, and intended to devise, a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

67.	On or about the dates listed below, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants listed below, for the purpose of executing and attempting to execute the foregoing scheme and artifice, transmitted and caused to be transmitted, writings, signs, signals, pictures, and sounds by means of wire and radio communication, in interstate commerce, to wit: electronic communications and electronic transfers of funds which Defendants and others caused to be sent to, and received, as described below, each wire communication or transfer of funds constituting a separate count of this indictment:

| Count | Approximate Date | Approximate Amount | Originating Bank | Receiving Bank | Defendant(s) Charged |
|---|---|---|---|---|---|
| 9 | 10/28/2019 | $10,000 | PNC Bank | Wells Fargo Bank | COLLINS, GRAHAM |
| 10 | 10/30/2019 | $2,475 | J.P. Morgan Chase Bank | PNC Bank | COLLINS, GRAHAM |
| 11 | 11/8/2019 | $10,000 | PNC Bank | Wells Fargo Bank | COLLINS, GRAHAM |
| 12 | 11/13/2019 | $2,475 | J.P. Morgan Chase Bank | PNC Bank | COLLINS, GRAHAM |
| 13 | 1/23/2020 | $10,000 | PNC Bank | Wells Fargo Bank | COLLINS, GRAHAM |
| 14 | 1/24/2020 | $2,475 | J.P. Morgan Chase Bank | PNC Bank | COLLINS, GRAHAM |
| 15 | 4/16/2020 | $25,000 | PNC Bank | Wells Fargo Bank | THOMAS, COLLINS, PAULSON |
| 16 | 6/5/2020 | $25,000 | Bank of America | Wells Fargo Bank | THOMAS, COLLINS, PAULSON |
| 17 | 7/7/2020 | $10,000 | Bank of America | Wells Fargo Bank | THOMAS, COLLINS, PAULSON |

All in violation of the Title 18, United States Code, Section 1343.

<u>COUNTS 18-21</u>
(Mail Fraud, 18 U.S.C. 1341)

The Grand Jury further charges:

68.     The factual allegations contained in paragraphs 1 through 57, and 61-62(v-w), 62(y), 62(ww)-(qqq), 62(cccc-bbbbb) are re-alleged and incorporated as though fully set forth herein.

69.     From on or about October 22, 2019, through on or about August 18, 2020, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants listed below, and others known and unknown to the Grand Jury, knowingly devised, and intended to devise, a

scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises.

70.     On or about the following dates, in the Northern District of Ohio, Eastern Division, and elsewhere, the Defendants listed below, for the purpose of executing and attempting to execute said scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, knowingly deposited and caused to be deposited to be sent and delivered by the United States Postal Service and private and commercial interstate carriers, in accordance with the directions thereon, the following matter, each mailing constituting a separate count of this Indictment:

| Count | Approximate Date | Originating Location | Receiving Location | Defendant(s) Charged |
|-------|------------------|----------------------|--------------------|----------------------|
| 18 | 4/30/2019 | Canfield, Ohio | Irvine, California | PEARLMAN, KINGSFIELD, DURANTE |
| 19 | 11/04/2019 | Las Vegas, Nevada | Cleveland, Ohio | COLLINS, GRAHAM |
| 20 | 11/26/2019 | Las Vegas, Nevada | Cleveland, Ohio | COLLINS, GRAHAM |
| 21 | 3/9/2020 | Las Vegas, Nevada | Cleveland, Ohio | COLLINS, GRAHAM |

All in violation of the Title 18, United States Code, Section 1341.

<u>FORFEITURE</u>

The Grand Jury further charges:

71.     The allegations of Counts 1 through 21, inclusive, are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). As a result of the foregoing offenses, Defendants THOMAS COLLINS, PATRICK THOMAS, HUGHE DUWAYNE GRAHAM, BRIAN KINGSFIELD, TYLER PAULSON, GARY

KOULETAS, DAMON DURANTE, PAUL GIARMOLEO, and DALE PEARLMAN shall

forfeit to the United States all property, real and personal, which constitutes - or is derived from -

proceeds traceable to the commission of such offenses; including, but not limited to, the

following:

    a.)    2016 Mercedes-Benz, VIN: WDDKJ6FB7GF320754.  HUGHE DUWAYNE

GRAHAM purchased this vehicle on or around November 2018.  The vehicle presently is valued

at approximately $20,000.00 and is titled to a third party.


A TRUE BILL.


Original document  - Signatures on file with the Clerk of Courts, pursuant to the E-Government

Act of 2002.

34